**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | No. 19-CR-2042-CJW-MAR |
| vs. | | **SENTENCING OPINION** |
| ALBERTO QUINTO-PASCUAL, | | |
| Defendant. | | |

_____

### *I.    INTRODUCTION*

This matter came on for sentencing on July 30, 2020. (Docs. 58 & 59). Defendant was convicted of possessing a firearm with an obliterated serial number and as an unlawful drug user, in violation of Title 18, United States Code, Sections 922(g)(3), 922(k), 924(a)(1)(B), and 924(a)(2). (Docs. 2 & 29). The government objected to paragraph 36 of the Presentence Investigation Report ("PSR"), arguing that defendant's base offense level should be determined by a cross-reference to the murder guidelines. (Doc. 39, at 13-14). On July 30, 2020, the Court heard nearly a full day of evidence with the government calling the medical examiner, the victim's girlfriend, three jailhouse informants, and the case agent. Defendant also testified. The Court took the case under advisement at the close of the day and reconvened on the morning of July 31, 2020, to pronounce its findings and impose sentence. The Court sustained the government's objection and found defendant used the firearm at issue to commit murder in the second degree. At the sentencing hearing, the Court announced its ruling and explained its reasoning. This sentencing opinion is intended to provide a written record of the Court's reasoning to aid the parties and the Eighth Circuit Court of Appeals, should one of the parties appeal the sentence.

## II. RELEVANT BACKGROUND[1]

In the early morning hours of May 10, 2019, the victim, A.F., died of a gunshot wound to the head. The entrance wound was slightly above his right ear. (Doc. 52). The shooting occurred at defendant's friend M.A.'s house where defendant stayed on occasion. Defendant and the victim were alone at the house, having just left a bar together. Defendant called 9-1-1, but not for about a half-hour after the shooting. Defendant claims the victim shot himself, suggesting that it was either an accident or suicide.

Officers interviewed defendant that morning. The interview was recorded by video. During the interview, defendant claimed he met the victim for the first time that night, the victim bought him a beer, and the victim accompanied defendant to the house where the shooting took place. Defendant claimed there was an unloaded gun in the house, but that it was not his gun. Defendant told officers he showed the gun to the victim. Defendant said the victim took the gun, placed it to his own head, and pulled the trigger several times. Defendant claimed he then took the gun back from the victim and put it in his waistband. Defendant claimed they smoked some methamphetamine and then the victim asked to see the gun again. Defendant said he gave the gun back to the victim and then turned away for a second when the victim shot himself. When officers confronted defendant with evidence that he was previously seen with the gun, he admitted lying to officers and admitted borrowing the gun from another man.

---

[1] The Court will not repeat all of the offense conduct here. The facts are laid out in great detail in paragraphs 4 through 31 of the PSR and are generally uncontested by the parties. To the extent defendant objected to any of the details in these paragraphs, the Court did not rely upon them in making its findings.

The government charged defendant that same day, and he was ordered detained. While detained in a local jail, defendant had contact with other inmates, three of whom testified against him during the sentencing hearing.

At the sentencing hearing, the sole factual dispute was whether defendant intentionally shot the victim or whether the victim accidentally shot himself. The sole disputed Guidelines issue was whether the cross-reference for first- or second-degree murder should apply.

### III. COURT'S FINDINGS

The parties and evidence left the Court with two possibilities; the victim accidentally shot himself, or defendant intentionally shot the victim. There was no evidence or suggestion of a third party shooting the victim, nor was there evidence or even argument that would support a conclusion that the victim committed suicide. Thus, the question was whether the government proved by a preponderance of the evidence, that it was more likely than not, that defendant intentionally shot the victim. If the Court found the government proved this, then the Court had to determine the classification of the killing, that is whether it constituted murder in the first degree or second degree.

The Court found the government proved by a preponderance of the evidence that defendant shot the victim and is guilty of murder in the second degree. This was a close case. Were the government's burden here proof beyond a reasonable doubt, the Court may not have found the government met that burden. But for the reasons the Court explained at the hearing and will summarize here, the Court found that the government proved that it was more likely than not that defendant intentionally shot the victim, as opposed to the scenario that the victim accidentally shot himself.

While the Court based its findings on the totality of the evidence, the Court will highlight below its factual findings on the most material issues in dispute.

3

### A. *Physical Evidence*

The forensic evidence from the victim's body showed that this clearly was not a contact shooting, and unlikely a shooting that occurred within inches of the victim's head. The absence of any of the forensic evidence consistent with such a close shooting—searing, muzzle imprint, stippling, lacerations, blowback of biological material found on the weapon—strongly militate against such a finding. The presence of a soot-like material in the path of the entrance wound is more consistent with bullet wipe, in Dr. Dennis Firchau's words, than with soot. This means that the bullet carried debris from the barrel of the weapon with it into the wound, as opposed to debris being expelled from the weapon into the wound from a short distance away.

The question then is whether the victim was capable of holding the gun in such a position himself that he could have accidentally shot himself with the barrel more than several inches away from his head. Although it is possible, and the Court need not engage in a series of hypothetical examples of how the victim could have done it, the Court found it highly unlikely. The victim would had to have contorted his body in an unlikely configuration and discharged the gun in such a way as to both keep the barrel a fair distance from his head and yet shoot himself in the head just above and behind his right ear purely by accident. That such an unlikely event occurred defies common sense.

Defendant's testimony that, after the shooting, the victim was still standing and holding the gun negates the possibility that the victim had his body in some contorted position. Given the unique features of this gun and the safety (which was on the backside of the handle of the weapon), an accidental self-shooting is all the more unlikely.

The victim's DNA was found on the trigger guard. That does show he touched the gun. When, and how and why was not clear from the evidence. Defendant easily could have let the victim handle the gun, as he claims he did, and still shot the victim. Thus, although the victim's DNA on the trigger area of the firearm is some evidence that

4

he discharged the weapon himself, it is not enough to overcome the other evidence.

At the sentencing hearing, for the first time, defendant testified that he loaded the weapon after he retrieved it from the victim and then, when the victim wanted to see the weapon again, defendant unloaded the weapon but that one of the bullets must not have been expelled from the weapon. The Court found this scenario to be implausible. The Court's inspection of the ejection mechanism of the weapon strongly suggests that if there was a defect, it would have affected the ejection of all the shells, not just one. The Court saw no defect in any of the rings that would serve to eject bullets. Further, to believe this scenario, the Court would have to believe defendant emptied the gun, did not see the remaining bullet, did not count to five the bullets in his hand, that he closed the chamber, that the remaining bullet just happened to land in just the right spot such that when the victim pulled the trigger the gun expelled the bullet as opposed to the hammer landing on an empty chamber.

### B. Defendant's Conduct

Defendant's conduct before and after the shooting is incriminating.

#### 1. Before

Defendant would have the Court believe that he never met the victim before, the victim bought him a drink at a bar, the victim showed defendant an empty meth pipe in the bar's bathroom, and defendant invited the victim to defendant's friend's house to use meth. Although possible, this seems a highly unlikely course of events.

That story is further called into question by two key pieces of evidence: the absence of a meth pipe on the victim and the victim's girlfriend's testimony. Defendant claims the victim showed him an empty meth pipe, but no pipe was found on the victim after the killing. Through a cross-examination question, it was suggested the victim gave the meth pipe to the bartender. The question is not evidence. Regardless, it is an unlikely scenario. According to the uncontested portion of the PSR (paragraph 18), the bartender

5

had just met the victim two days before the shooting. There is no logical reason why the victim would give his meth pipe to a bartender he barely knew. Further, the fact that defendant gave this version of events for the first time during the sentencing hearing suggests it was untrue. Not once during the lengthy interview he gave with law enforcement officers after the shooting did defendant mention the incident of the victim allegedly showing him an empty meth pipe in the bar bathroom.

Second, the victim's girlfriend testified that defendant and the victim knew each other. She knew defendant worked in construction, knew about his meth use, and knew about the existence of the brown house where the victim was shot. That the victim and defendant knew each other is more consistent with them drinking together at a bar and the victim accompanying defendant to the brown house than that they were total strangers until that night. Through cross-examination, defendant suggested that the victim's girlfriend parroted information she gleaned from a newspaper article and defendant's Facebook profile. She denied both. Although, again, it is possible, the Court found it highly unlikely. The Court also had the benefit of observing her testimony. The Court found her manner, tone, and demeanor while testifying to be credible.

### 2. *After*

Defendant's conduct after the shooting was also highly incriminating. If the shooting was a result of the victim accidentally shooting himself, then defendant's conduct was very odd indeed. One would think that his natural response would have been utter horror, and that he would have rushed out of the house and immediately sought help. Instead, he removed, wiped down, and carefully hid the weapon. He then walked, or perhaps ran, to his friends J.C. and S.M.'s house about four and a half blocks away. But when he arrived there, he paced around and sat outside for approximately 18 minutes. Only then did he go inside and after another few minutes reluctantly called 9-1-1 after prompting from his friends.

6

It is possible that his odd and objectively incriminating conduct could be explained away by defendant's intoxicated state (he had three beers and smoked methamphetamine that evening) and the stress of the situation. People do odd things in the midst of a crisis. And thus, the Court must discount any conclusion that it can draw strictly from defendant's behavior after this event.

Nevertheless, the Court found defendant's conduct more consistent with defendant intentionally shooting the victim than the victim accidentally shooting himself. The Court found it much more likely defendant shot the victim, wiped down the gun and hid it, and ran, initially considering the possibility of denying any presence or involvement in the shooting. His delay in entering his friends' house and calling 9-1-1 suggests planning and plotting a different explanation that he thought would sell—that the victim shot himself. Calling 9-1-1 and showing the officers the location of the weapon and bullets would be consistent with him adopting a new story, although it could also be some evidence of his innocence. The Court simply found that removing, wiping down, and hiding the weapon is simply too consistent with defendant's guilt to be overcome by his delayed calling of 9-1-1.

### 3. *Defendant's Statements*

The Court found that defendant's ever-changing stories and series of false statements to law enforcement officers was the most incriminating evidence against defendant. Again, defendant asks the Court to discount these inconsistent and false statements as a product of intoxication, stress, and just poor memory. Although it is possible those factors could have affected the accuracy of defendant's statements, the Court found it unlikely. The Court watched the videotape of defendant's interview twice. During the interview, defendant did not act as if he is out of control, under the influence, or overcome by stress. He became animated only when the investigator confronted him with inconsistencies and false statements. Further, there are just too

7

many, and too important, inconsistencies and falsities to write them off as a product of intoxication, stress, and poor memory.

It would be hard to capture each of the inconsistent and false statements, but the Court will emphasize what it believes to be the most important ones.

Defendant said he had never met the victim. The Court found that to be false. The victim's girlfriend convincingly testified otherwise. Further, defendant's explanation that a total stranger bought him a drink and then accompanied him back to a house where he just happened to accidentally shoot himself simply does not ring true.

Defendant lied about owning the gun, then how he got the gun. Defendant admitted he lied about possessing the gun during the interview, but still insisted that a man loaned him the gun. Later he changed his story to having purchased the gun for an "8 ball" of methamphetamine.

Defendant provided multiple inconsistent statements about how the victim allegedly ended up with the gun in his hands and the condition of the gun. At first, defendant claimed he picked up the gun when he immediately entered the house. Later, he said he went back to the other room and retrieved the gun. Defendant said the gun was unloaded, handed it to the victim, the retrieved it from the victim, then later gave it back to the victim, who somehow retrieved a bullet from somewhere, loaded the gun, and then accidentally shot himself. Then the story changed to defendant loaded the gun for a reason he was unable to explain and then unloaded the gun before handing it back to the victim, but somehow missed one bullet that did not come out of the gun when he unloaded it.

The timeline is inconsistent with all the events defendant claims occurred that evening. Between a video recording at the bar and a video showing defendant at his friends' house after the shooting, the government convincingly established that there was at most about fourteen minutes between the time defendant and the victim left the bar and

8

when defendant showed up at his friends' house after the shooting. During that time, if the Court were to believe defendant, he and the victim left the bar, drove approximately eleven blocks (Doc. 51–6), entered the house, handed the gun back and forth several times, found a meth pipe, smoked some methamphetamine, the victim shot himself, defendant left the house, reentered the house, removed the gun, wiped it down, hid the gun, and then either walked or ran about four and a half blocks to his friends' house. Although it is possible all of this occurred in such a compressed period of time, it seems highly unlikely.

Defendant lied about kicking or throwing the gun under the car. Defendant told officers repeatedly that he kicked or threw the gun under a car parked in an alley near the house where the victim was shot. Even when defendant told officers where to look, though, officers could not at first find the gun. Defendant had to provide more help. The gun was placed carefully by a tire beneath the car in a clear effort to conceal the firearm. In other words, the firearm did not end up under the car as a result of a distraught action by a man overcome with stress after the victim accidentally shot himself. Rather, it was the action of an intentional and careful effort to hide a murder weapon.

Defendant's story about the victim putting the gun against his head and pulling the trigger suggests that defendant was trying to plant the seeds of a suicide story. When speaking with officers immediately after the shooting, as captured in the videotaped interview, it appears clear to the Court that defendant was attempting to sell the officers on a theory that the victim killed himself. When the forensics and other evidence was found wanting, defendant shifted his story to an accidental shooting. The Court finds defendant's claim that the victim took a firearm and placed it against his head and pulled the trigger several times simply to be unbelievable. It is not consistent with common sense or any of the other evidence.

9

In short, the Court found defendant's inconsistent and false testimony to be highly incriminating. The Court further found defendant's testimony at the sentencing hearing to be incredible. The Court bases this conclusion on all the contrary evidence and also on the Court's observations of defendant while testifying. His testimony was halting and appeared calculated. He had to correct himself multiple times. There were long pauses before he answered several of the prosecutor's questions. He repeatedly glanced at the Court during his testimony in what the Court interpreted as an attempt to read the Court's reactions to his testimony. Although that alone is not significant and understandable that a witness would want to gauge how an audience is accepting testimony, combined with the rest of his demeanor and tenor of testifying, it bespeaks to the Court of someone who was spinning a yarn and trying to see if the audience was buying it.

### 4. *Jailhouse Informants*

The jailhouse informants provided testimony that included some incriminating statements and also provided a motive for the killing. In whole, the Court found their testimony to be credible. Defense counsel did a fine job cross-examining the informants (as he did all witnesses) and pointed out some inconsistencies, motives to lie, and some opportunities to jointly fabricate information. Nevertheless, in addition to their demeanors, which the Court found to be calm and matter of fact, the Court found their testimony credible for several other reasons.

First, none of the witnesses provided exaggerated testimony. If their goal was to lie to get a sentencing reduction, it would have been the easiest thing in the world for each of them to come before me and claim that defendant confessed to shooting the victim. Instead, J.V. said only that defendant told him that the victim shot himself after being confronted as being a snitch. L.T. testified that defendant told him that the victim shot himself, but later asked L.T. if he (defendant) should have shot the victim somewhere else. C.S. testified that defendant told him he was in trouble for killing someone and

admitted to killing the victim, but later claimed to C.S. and others that it was a suicide. These are not consistent, rehearsed statements such that they indicate cooperators fabricating a story. The first two ring true in particular because neither claims defendant made an outright confession. Had these witnesses come to Court to lie in order to get a sentencing reduction, it would have been very easy for them to simply claim that defendant told them that he intentionally shot the victim. That they did not make such statements strongly suggests that they simply told what defendant told them.

Second, the testimony of L.T. and C.S. carry credibility because neither sought out the authorities to trade their information for a sentencing reduction; the authorities sought them out.

Third, each of the informants was consistent in general terms about defendant's involvement in the drug trade. Yet, they were not so consistent to suggest a rehearsed story. The testimony from J.V. and C.S. support the conclusion that defendant was involved in the drug trade; these experienced drug dealers would have seen through a charade had defendant simply been posing in jail as a drug dealer.

Fourth, all three knew where the victim had been shot.[2] This was not public information. That defendant told others where the victim was actually shot (he told the investigator he saw blood in front of the victim's ear and thought the entrance wound was there) tells the Court defendant shot the victim. Otherwise, the Court would have to believe that defendant turned around after the victim accidentally shot himself and fell to the couch. Defendant then took the time to look for the entrance wound (although he would have the Court believe he was surprised and horrified by the event), possibly having to turn or manipulate the victim's head, to search out where the victim had shot

---

[2] To be sure, each testified that defendant told him the victim was shot behind and somewhat below his right ear, when in fact the entrance wound was above and slightly behind his right ear. This strikes the Court as an immaterial variation on the approximate location of the entry wound.

himself. This seems unlikely.

The government argues that the motive for the killing was drug-related. Defendant made statements to the informants that the victim was a law enforcement informant. That the victim was involved with drugs was born out (despite his girlfriend's ignorance of it) by the autopsy report that showed methamphetamine in the victim's system. The motive evidence, however, is not strong. There is no evidence the victim was an informant, as defense counsel pointed out, but that would not be necessary. This would not be the first case in which a drug dealer harmed someone on a false or mistaken belief the person was an informant. There is little other evidence either, though, that defendant had reason to believe that he or others were the subject of an investigation, or that the victim was an informant. Defendant did mention a law enforcement officer's name, Berry, to C.S. That there is a Waterloo narcotics officer by the last name Berry who works with informants, though, is compelling. There is no way that C.S., who was not involved in the Waterloo drug trade, would know that name. On the other hand, there is no other evidence, such as statements defendant made to others about informants or past threats to informants, to bolster the motive evidence. It is also possible that there was no motive; that defendant was high on meth and perhaps the victim said something that angered defendant. We may never know.

Motive, though, is not an element of the offense. And although the evidence of motive here is not strong, it is sufficient.

### C. *Finding on the Cross-Reference*

Thus, the Court found that the evidence showed defendant intentionally shot the victim. The discussion of possible motive leads into the question of the degree of homicide the government proved. The government asked the Court to find first-degree murder based on the drug motive theory, defendant's attempt to get the victim to meet him previously, and defendant's actions of luring the victim to an otherwise empty house.

12

Although this is some evidence of premeditation, it is not enough for the Court to find by a preponderance of the evidence that defendant engaged in premeditated murder. There is simply no other evidence of premeditation.

On the other hand, although the Court can hypothesize, as it did, that it was possible the victim said something to anger defendant, there is no evidence to support that. Nor does defendant claim, or is there evidence to support, that defendant accidentally shot the victim. Thus, the Court was left with an intentional shooting with malice aforethought: murder in the second degree.

The Court sustained the government's objection to paragraph 36 of the PSR. The Court found the cross-reference to United States Sentencing Guidelines ("USSG") Section 2K2.1(c)(1)(B) applied, and the most applicable Guidelines section was 2A1.2(a), providing a base offense level of 38. The Court found defendant lied during the sentencing hearing. He lied when he claimed not to have known the victim before the night of the murder. He lied when he claimed he loaded and then unloaded the gun and a bullet happened to stick in the chamber. He lied again when he claimed the victim showed him an empty meth pipe. Thus, the Court found defendant obstructed justice. Under USSG Section 3C1.1, there would be a two-level enhancement. The Court found defendant did not accept responsibility, and thus the total offense level would be 40. With a Criminal History Category of III, the advisory Guidelines range of imprisonment would be 360 months to life in prison without the possibility of parole. Because the statutory maximum of the counts of conviction is 180 months, however, the effective advisory Guidelines range of imprisonment is 180 months.

When orally pronouncing sentence, the Court erred in failing to account for the increase in the offense level for obstruction of justice. Thus, the Court pronounced a total offense level of 38, and an advisory Guidelines range of 292 to 365 months. An oral pronouncement of the sentence governs over any written pronouncement or judgment

when there is a conflict. The error, however, was harmless because the statutory maximum sentence is 180 months. Defendant did not argue for a downward variance and the Court found no downward variance warranted under the factors at Title 18, United States Code, Section 3553(a). Thus, the Court imposed a sentence of 180 months' imprisonment.

If the Court of Appeals finds that the Court erred in concluding the evidence supported application of the cross-reference at USSG Section 2K2.1(c)(1)(B) to murder in the second degree, then the Court would make the following Guidelines findings: Defendant's base offense level would be 14, under USSG Section 2K2.1(a)(6)(A). There would be a four-level enhancement for possession of a firearm with an obliterated serial number under USSG Section 2K2.1(b)(4)(B), and a four-level enhancement for possession of a firearm in connection with another felony offense under USSG Section 2K2.1(b)(6)(B). The Court would again find obstruction for the same reasons, resulting in a two-level enhancement under USSG Section 3C1.1, and find that defendant had not clearly accepted responsibility. The resulting advisory Guidelines range would then be 63 to 78 months. The Court makes no finding at this time whether the Court would sentence defendant within the advisory Guidelines range, or where within that range.

## IV.   CONCLUSION

For these reasons and for the reasons stated during the sentencing hearing, the Court sustained the government's objection to paragraph 36 of the PSR and imposed a sentence of 180 months' imprisonment, consisting of 60 months on Count 1 of the Indictment and 120 months on Count 2 of the Indictment, with the terms to be served consecutively.

**IT IS SO ORDERED** this 3rd day of August, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa